[Cite as *Loughman v. Loughman*, 2014-Ohio-2449.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

TERESA LOUGHMAN                                    :

    Plaintiff-Appellee                          :          C.A. CASE NO.    25835

v.                                                 :          T.C. NO.    12DR249

DAVID LOUGHMAN                                     :          (Civil appeal from Common
                                                                      Pleas    Court,    Domestic
Relations)
    Defendant-Appellant                         :

                                                   :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____6th____ day of _____June_____, 2014.

. . . . . . . . . .

TERESA LOUGHMAN, 3141 Muriel Avenue, Kettering, Ohio 45429
    Plaintiff-Appellee

DAVID LOUGHMAN, 5361 Salem Bend Drive, Apt. C, Trotwood, Ohio 45426
    Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the Notice of Appeal of David

Loughman,

filed July 19, 2013. David appeals from the Domestic Relations Court's June 24, 2013 Final

Judgment and Decree of Divorce. We hereby affirm the judgment of the trial court.

{¶ 2} David and Teresa Loughman were married on February 14, 1992, in

Trotwood, and they have four daughters, namely C.L., whose date of birth is August 9, 1995;

T.L., whose date of birth is March 8, 1997; F.L., whose date of birth is June 7, 2000; and

D.L., whose date of birth is January 18, 2002. Teresa filed a Complaint for Divorce on

March 13, 2012. On April 4, 2012, the court issued a Temporary Order pursuant to which

David was ordered to pay Teresa temporary spousal support in the amount of $1,012.00 per

month beginning March 1, 2012. The order provided that David "shall have the right, option

and privilege of discharging this monthly spousal support by paying the mortgage/rent and

basic utilities at the marital residence." On April 5, 2012, David filed a pro se Response to

Complaint for Divorce.

{¶ 3} On April 9, 2012, the court issued an Order Scheduling Mediation. On May

25, 2012, the Affidavit of David Loughman was filed. On June 18, 2012, the court issued

an Order Referring Case to Family Relations Department for a family investigation.

{¶ 4} The parties' final hearing occurred on March 18, 2013. Teresa appeared,

represented by counsel, and David appeared pro se. Counsel for Teresa read the parties'

partial agreement into the record as follows:

MR. SHEETS: * * *

As noted, the real estate is in foreclosure. I think both parties

understand that at some point a judgment may be rendered against both of

them; they will be equally responsible for that debt.

* * *

MR. SHEETS: That the automobiles have been divided to their satisfaction. * * *

* * *

MR. SHEETS: The parties are in agreement that the wife will have custody of the four minor children. The other issues relating to the children basically are not agreed upon.

* * *

MR. SHEETS: We don't have agreement on debts.

* * *

The personal property is agreed upon with brief exceptions. The wife had placed a wheelchair, a TENS unit, and walker out for Mr. Loughman to pick up. As far as she knows he or his friend of his (sic) picked those items up. He says those items were not there.

The parties have agreed that Mrs. Loughman and Mr. Loughman will make arrangements for him to get the keys to the house from her so he can go over and check and see if those items are still in the house.

{¶ 5} After both parties acknowledged that they heard and understood the partial agreement as read into the record, the court indicated that the report of the Family Relations Department would be admitted as Court's Exhibit I. Teresa then testified that she resides at 3141 Muriel Avenue in Kettering, that she is employed part time at Arby's, and that she also receives Social Security Income for the children as a result of David's disability. She stated that she receives a total of $444.00 a month for all of the children, and that the Social

Security Income has been reduced by $20.00 a month per child because David owes an arrearage of $14,000.00. Teresa stated that the arrearage "should be Mr. Loughman's responsibility because he knew the rules set forth from Social Security before he started working." She requested that David be required to compensate her in the amount of $80.00 per month to account for the reduction in income.

{¶ 6} Teresa testified that the county welfare agency obtained a judgment against the parties in the amount of $2,200.00. The following exchange occurred:

Q. * * * What's your position with regard to who should be responsible for that debt? Should it be divided between you or do you feel that that's your debt or Mr. Loughman's debt?

A. I would be willing to take that if he takes the other credit card debts.

Q. Have you already made partial payments on that Welfare debt?

A. Yes. They take my Ohio State every year for that.

Q. So they took your 2012 tax refund from the State?

A. Correct.

Q. * * * They do that for 2011 also?

A. Yes, but it was in both our names in 2011.

Q. So they took the joint return in 2011?

A. Right.

{¶ 7} Teresa testified she has a balance due on a Kohl's department store credit card, and that the card was used for "the children's Christmas." She stated that she has been making the payments and will continue to do so. Her financial disclosure affidavit reflects

that the balance due is $700.00. Teresa stated that there is also a balance due on an H.H. Gregg account in the amount of $1,100.00, and that she and David "should probably split it because it was used for the household."

{¶ 8} The following exchange occurred:

Q. * * * There's a debt listed to Orchard Bank, a credit card for Orchard bank, are you aware of what that debt is?

A. No, I sure don't.

Q. Not a credit card that you had or used?

A. No.

Q. * * * And there's also a bank overdraft fee of $300.00 owed. Are you aware of where that came from?

A. That is - - that came from where enough money was not in the bank to cover some of our bills and it took it out of that.

Q. During the time that occurred were you working?

A. No.

Q. Did you have any income?

A. No, I did not.

Teresa requested that David assume responsibility for the overdraft charge. Teresa testified that she has not received any money directly from David, and that he did make the house payment in March, 2012.

{¶ 9} Regarding visitation, Teresa stated that she would like David's visitation to be supervised at Erma's House. She stated that she believes David needs to attend an anger

management program, because he has relied upon "[h]itting, yelling, knocking food out of a child's hand" as discipline, and because the children "don't feel safe" in his care. Teresa stated that David has had no contact with the children in the last year. Teresa asked the court to adopt the recommendations provided by the family services department.

{¶ 10}  David testified that he is disabled and unable to work. He testified that he receives $930.00 a month in Social Security Income, and that the amount he receives reflects a monthly reduction of $100.00 due to an arrearage that he owes. David stated that he lives in a two-bedroom apartment. The following exchange occurred:

> THE COURT: You heard your wife's testimony as to the debts?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Are you in agreement with what she suggested?   And let me just run through to make sure you understand.  That you would be responsible for the arrearage owed on the SSD overpayment essentially.
>
>  She would take the debt owed to Montgomery County.  She would take the debt owed to Kohl's.
>
> You would take the Orchard Bank, the bank overdraft.
>
> And then the two of you would split the H H Gregg and split whatever deficiency if they collect any on the house.
>
> THE DEFENDANT: We should also split the overdraft because that was marital, both joint account.  And also should split the Orchard Bank which was Mastercard which she used more than what I ever used and she has one in her name as well, Orchard Bank.  She had a card of her own at

Orchard Bank, a Mastercard that she used more than I ever did. And this is like the overdraft fees of her. You can go back and check the records.

Her bank card's the one that done most of everything because she had my debit card hidden two years. I never seen mine. She took my debit card from the mail and she hid it from me, my debit card.

And then also last year the income taxes, which are $6,000, she had on a deposit on a card. I never seen none of it either. It was gone.

THE COURT: So you're willing to do everything that was suggested with the exception you want to split Orchard Bank and the bank overdraft as well.

THE DEFENDANT: Yes, sir.

**{¶ 11}** David stated that he made the March and April, 2012 house payments, and that he made no payments to Teresa directly. When asked about visitation, David stated that he wanted "[v]isitation every other weekend, every other holiday and half day on birth dates. They don't have to spend the night to begin with, they can just come for the day; that wouldn't bother me." David denied that he has an anger management problem, but he stated that if ordered to do so, he will attend an anger management program. David denied physically abusing the children. David acknowledged that he has not seen the children in over a year. He stated, "I've tried to contact them through Facebook, through text messaging and stuff like that with the numbers I have, and I never get no responses from them."

**{¶ 12}** The court issued a Decision on May 17, 2013. Regarding real estate, the

court determined that the marital residence "has gone into foreclosure and the parties agree that they will be equally responsible for the debt associated with said foreclosure." Regarding personal property, the court determined that the parties "have divided their personal property to their mutual satisfaction with the exception that Teresa indicated she placed a wheelchair, a TENS unit, and a walker out for David to pick up and that parties are unsure if those items were retained by David. If Teresa has these items, they will be given to David." The court declined to order spousal support, noting that the parties' incomes are "virtually identical," and it declined to retain jurisdiction over the issue of spousal support.

{¶ 13} After noting that the parties agreed that Teresa shall have custody of the children, regarding David's parenting time, the court determined as follows:

* * *

The Family Relations Department was appointed to conduct a family investigation in their matter (sic). The Family Investigator recommended that David exercise his parenting time through a neutral third party. If that was not possible, then his parenting time should be exercised at Erma's House. The Family Investigator also recommended that David attend anger management and that he should rearrange his residence so that it is more suitable for minor children to visit.

After having considered the testimony of the parties, their credibility and demeanor, the family investigation submitted by the Family Relations Department, all the statutory factors in ORC 3109, the court finds that it would be in the best interest of the minor children that parenting time be

supervised through Erma's House. The court attaches a great deal of significance to the report of the Family Relations Department. The Family Investigator indicated that the children are very uncomfortable in their father's presence at this time. Additionally, the Family Investigator expressed concerns about the lack of contact that existed between David and the children after the parties' separation. Furthermore, this matter shall be set for a review hearing in 120 days to determine if David and the children have reconnected in such a fashion that supervised parenting time is no longer warranted.

**{¶ 14}** The court determined that "there will be no child support at this time as a result of the payment received on behalf of the children from Social Security Disability which exceeds or is equal to the amount of child support that David would otherwise be ordered to pay." The court then determined as follows:

However, the court finds that David shall pay directly to Teresa, $80.00 per month. This number reflects the sum being withheld from the children's Social Security payments as a result of David working in excess of the Social Security Disability Administration guidelines for collecting disability. The court finds it would not be appropriate to punish the children for David's behavior, and as a result, David shall pay $80 per month directly to Teresa to make up the difference until such time as the repayment ceases. Teresa shall provide David with documentation of what she is receiving for the children from the Social Security Disability Administration on a monthly

basis.

{¶ 15} Regarding the parties' debts, the court determined that Teresa will be responsible for the $2,200 debt to Montgomery County regarding public assistance payments, as well as the outstanding debt to Kohl's. Regarding H.H. Gregg, the court noted that Teresa testified that "this debt was used for purchasing marital items and that both parties have retained these items. * * * David gave no testimony as to this debt." The court found "Teresa's testimony to be credible and [found] that the parties shall be equally responsible" for the H.H. Gregg debt. Regarding the Orchard Bank debt, the court noted that Teresa "testified that David was the only individual who used this debt (sic), that she believed it was used for nonmarital items, and that David should be responsible for this debt. David did not testify as to the debt." The court determined that "David used the Orchard Bank credit card for non-marital purposes, and as a result shall be solely responsible for said debt * * * ." Finally, regarding the bank overdraft, the court determined that the debt "was a result of the parties purchasing items for necessaries during the course of their marriage, and as a result, it is a marital debt" to be shared equally.

{¶ 16} Regarding the temporary order issued on April 4, 2012, the court determined as follows:

> * * * David was ordered to pay Teresa the sum of $1,012 per month, effective March 1, 2012. At the time the order was instituted, David was receiving $12,360 annually from Social Security Disability and was earning an additional $13,000 annually from McDonalds.
>
> Teresa testified that David paid this sum in March of 2012, but has

paid nothing since. David testified that he paid both March and April of 2012.

The court finds David's testimony to be credible in this matter in that he paid both March and April's Temporary Order payment. Therefore, as of March 1, 2013, David had a Temporary Order arrearage of $10,120. However, the court finds this number to be excessive given that for a significant portion of 2012 the only income that David was receiving was the Social Security Disability in the amount of $12,300 annually. If the Temporary Order were kept in place, David's obligation under the Temporary Order would have nearly exceeded his annual income. The court finds that a temporary spousal support number of $400 per month would have been more equitable. Therefore, David's spousal support is reduced to $400 per month effective May 1, 2012, and as a result, the court finds that David has a Temporary arrearage of $4,000. Said arrearage shall be extinguished at the rate of $100 per month.

The trial court's Final Judgment and Decree of Divorce is consistent with its May 17, 2013 Decision.

{¶ 17} We initially note that David's brief does not comply with the requirements of Rule 16 of the Ohio Rules of Appellate Procedure, which provide that an appellate brief must contain a statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected, as well as a statement of the issues presented for review. We will construe each paragraph of David's brief as individual

assignments of error.

{¶ 18}   David's first assigned error provides:

"REAL ESTATE - PLAINTIFF WAS ORDERED TO LIVE IN HOME AND MAINTAIN IT, AT 2651 SOUTH BLVD., KETTERING, OHIO, 45419, UNTIL REAL ESTATE WAS SOLD.   SHE ABANDONED SAID HOME 2 MONTHS LATER WITHOUT NOTIFYING ME OF HER INTENTIONS."

{¶ 19}   The parties agreed at the final hearing that their home was in foreclosure, and that they would share the responsibility for any debt associated with the foreclosure.   At the time of the hearing, Teresa resided on Muriel Avenue, and the record does not contain an order requiring Teresa to remain at the marital home.   David's first assigned error is overruled.

{¶ 20}   David's second assigned error is as follows:

INCOME TAX, 2011-2012 TAX YEAR - WE HAD FILED JOINTLY AND WERE TO RECEIVE $6100.00 BACK FROM THE IRS. AFTER FUNDS WERE RECEIVED, SHE CHANGED THE LOCKS ON OUR HOME, AND SHE KEPT THE ENTIRE TAX RETURN WHICH I WAS ENTITLED TO HAVE HALF OF.   AS SHE KEPT THE TOTAL AMOUNT, I WOULD LIKE MY HALF OF THE RETURN CREDITED TO ANY ARREARAGE I HAVE ON CHILD SUPPORT OR ALIMONY.

{¶ 21}   As this Court has noted:

In divorce proceedings the trial court must divide the parties' separate and marital properties equitably. R.C. 3105.171(B). Marital property shall be

divided equally, unless a different division would be equitable. R.C. 3105.171(C). Marital property includes all real and personal properties or interests therein that are acquired by either or both spouses during the marriage. R.C. 3105.171(A)(3)(a)(i). In determining what constitutes an equitable division of marital property, the trial court must consider all relevant factors, including those set forth in R.C. 3105.171(F). *Kestner v. Kestner*, 173 Ohio App.3d 632, 2007-Ohio-6222, 879 N.E.2d 849, ¶ 10 (7th Dist.). *Pentella v. Pentella*, 2nd Dist. Montgomery No. 25705, 2014-Ohio-1113, ¶ 7.

**{¶ 22}** "Appellate courts review a trial court's division of property under an abuse of discretion standard * * * ." *Id.*, ¶ 8. "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990). *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

**{¶ 23}** At the final hearing, David agreed that the only property in dispute was a wheelchair, a TENS unit, and a walker. In the course of discussing the parties' debts, he asserted that "then also last year the income taxes, which are $6,000, she had on a deposit on a card. I never seen none of it either." Given David's initial agreement as to the  parties' property, we cannot conclude that the trial court abused its discretion in failing to credit David's unsupported and conclusory testimony regarding the tax refund. David's  second

assignment of error is overruled.

**{¶ 24}** David's third assigned error is as follows:

**{¶ 25}** "H.H. GREGG - CREDIT CARD - I FEEL THAT SINCE SHE KEPT ALL THE MERCHANDISE, I FEEL SHE SHOULD BE RESPONSIBLE FOR PAYING THE ENTIRE DEBT."

**{¶ 26}** David agreed at the final hearing to Teresa's proposal that the parties' share responsibility for the H.H. Gregg debt. David's third assigned error is overruled.

**{¶ 27}** We will consider David's fourth and fifth assigned errors together. They are as follows:

"CHILDREN - SHE WAS ORDERED TO GIVE ME CONTACT INFORMATION, AND SHE HAS NOT DONE THAT. WHEN I DID FIND A WAY OF CONTACTING THEM, SHE CHANGED INFORMATION SO THAT I COULDN'T CONTACT THEM."

And,

"MEDICAL EQUIPMENT - SHE NEVER DID RETURN MY 2 WHEELCHAIRS OR TENS UNIT, AND I AND MY MOTHER WENT TO THE HOME TO MEET HER AND PICK THEM UP, BUT SHE NEVER CAME TO THE HOME WITH THE EQUIPMENT."

**{¶ 28}** This appeal is not the proper forum to address Teresa's alleged failure to comply with the Final Decree, but rather is limited to analysis of alleged error committed by the trial court in the proceedings below. Any such alleged failure to comply with the Final Decree is properly the subject of a motion before the trial court.

**{¶ 29}** We will consider David's sixth, eighth, and ninth assigned errors together.

They are as follows:

> I AM APPEALING THE DECISION OF THE FAMILY INVESTIGATION UNIT REFERRING TO THE ANGER MANAGEMENT AND THE SUPERVISED VISITATION AT ERMA'S HOUSE, AS NEITHER OF THESE ARE AN ISSUE, AND HOW CAN SOMEBODY PASS JUDGMENT ON SOM[E]BODY WHEN THEY ONLY SPENT A ½ HOUR WITH THEM.

And,

> "WHEN THE CHILDREN WERE INTERVIEWED BY THE FAMILY INVESTIGATION TEAM, THEIR STORIES WERE AS IF THEY WERE SCRIPTED. THE CHILDREN ARE TERRIFIED OF THEIR MOTHER BECAUSE IF THEY DON'T DO WHAT SHE TELLS THEM TO DO, SHE THREATENS THEM,"

And,

> "FAMILY INVESTIGATIONS STATED THAT MY APARTMENT WAS UNFIT, AND THEY WERE NEVER TO MY PLACE OF RESIDENCE TO INVESTIGATE."

**{¶ 30}** The Family Investigation Report may not be "appealed" herein, and we note the trial court did not order David to attend an anger management program. To the extent that David may be arguing that the trial court erred in ordering that his parenting time be supervised at Erma's House, as this Court has previously noted, the "statute governing parenting time enumerates fifteen factors plus '[a]ny other factor in the best interest of the child,' R.C. 3109.051(D)(16), that a court must consider 'in determining * * * parenting time matters under this section,' R.C. 3109.051(D)." *Marinella v. Marinella*, 2nd Dist.

Montgomery No. 25449, 2013-Ohio-2932, ¶ 11. "It is within a trial court's discretion to determine matters of parenting time." *Id*., ¶ 13.

**{¶ 31}** The court indicated that it considered the statutory factors. The Family Investigation Report, to which the trial court attached "a great deal of significance," provides that the investigator interviewed Teresa individually and with the children, David individually and with the children, and each of the children individually. The investigator also visited the homes of both David and Teresa. Regarding the "maternal family session," the report provides that there "was good camaraderie observed between the mother and the children, * * *. The children were very comfortable in the session and they freely interacted among themselves." Regarding the "paternal family session," the report provides that the "children were observed to sit apart from father in the lobby, and when entering the office area and conference room, they remained physically apart from father as much as was possible. The children did not initiate any conversation with father, and responded with short answers."

**{¶ 32}** Regarding the investigator's interview with C.L., the report provides that C.L. was 17 at the time, and that she "[a]sserts that father has abused her physically and emotionally over the years, and she believes that he could have attempted to see she (sic) and her sisters since the marital separation. She related that she has had no contact with father since May, nor has she had any desire to see him." The report provides that C.L. indicated "that it was further insulting to hear father refer to she (sic) and her sisters as being 'beautiful', whereas, he always used to refer to them as being 'worthless, fat and ugly.'"

**{¶ 33}** Regarding F.L., the report provides that she was 12 at the time of the

interview, and that she "doesn't really miss her father and would be very happy if the judge were to decide that she were to stay mostly with her mother. She related that she would be 'mad' if the judge were to decide that she would be mostly with father." The report provides that F.L. related that "her mother would likely send her to her room if she were to misbehave. In contrast, father would reportedly 'yell and cuss at us.'"

{¶ 34} Regarding T.L., the report provides that she was 15 at the time of the interview, and that she reported that "Father never came back to the home after he departed nor have there been any conversations with him. She feels 'fine' about this situation to continue, noting that she does not miss him." The report provides that T.L. "recalls most of father's interaction with her as being negative and that father was mean to them. Father would allegedly hit she (sic) and her sisters over the years mostly with his hand on their legs. She feels that father picked on her the worst." Regarding D.L., the report provides that she was ten and a half years old at the time of the interview, and that she "described that she doesn't really feel comfortable being with her father, describing him as being 'mean', and relating that over the years, he has 'hit me with his bare hands on my legs' and she also alleges that he has also used a paint stirrer on [C.L.] and broken it."

{¶ 35} Given the consistent statements by the children regarding David's abusive conduct and their reluctance to be in his care, we conclude that the trial court did not abuse its discretion in ordering that David's parenting initially be supervised subject to review in 120 days. David's sixth, eighth, and ninth assigned errors are overruled.

{¶ 36} David's seventh assigned error is as follows:

"PERSONAL PROPERTY - SHE DISPOSED OF ALL MY TOOLS, FISHING

EQUIPMENT, AND MOST OF MY CLOTHING AT YARD AND GARAGE SALES. ESTIMATED VALUE: $1,000.00, WHICH I WOULD LIKE APPLIED TO MY ARREARAGE, AS WELL."

**{¶ 37}** David agreed at the final hearing that the only personal property at issue was the medical equipment, and there was no evidence adduced regarding tools, fishing equipment and clothing. David's seventh assigned error is overruled.

**{¶ 38}** David's final assignment of error is as follows:

"REPAYMENT TO SOCIAL SECURITY - I SHOULD NOT BE SOLELY RESPONSIBLE FOR THE REPAYMENT BECAUSE THE WHOLE FAMILY BENEFITTED FROM THE MONEY. I FEEL IT SHOULD BE SPLIT 50-50 EACH MONTH, WHICH WOULD BE $40.00 EACH."

**{¶ 39}** David agreed to assume responsibility for the repayment to social security at the final hearing, and his final assigned error is overruled.

**{¶ 40}** Having overruled David's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

Teresa Loughman
David Loughman
Hon. Timothy D. Wood