[Cite as *Rucks v. Moore*, 2018-Ohio-4692.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| LANA J. RUCKS | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27928 |
| | : | |
| v. | : | Trial Court Case No. 2014-DR-460 |
| | : | |
| EDMUND H. MOORE | : | (Domestic Relations Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of November, 2018.

. . . . . . . . . .

LANA J. RUCKS, 2481 Edgewater Drive, Apt. 2, Dayton, OH 45431
        Plaintiff-Appellee, Pro Se

RICHARD HEMPFLING, Atty. Reg. No. 0029986, 15 W. Fourth Street, Suite 100, Dayton,
Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Edmund H. Moore appeals from a final judgment and decree of divorce entered by the Montgomery County Common Pleas Court, Domestic Relations Division. The judgment of the trial court will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings.

### *Factual Background and Procedural History*

**{¶ 2}** Moore and Lana J. Rucks were married on April 22, 2000, and are the parents of two minor daughters. Moore is an engineer and a civilian employee at Wright-Patterson Air Force Base. Rucks, who has a Ph.D. in psychology, has operated her own consulting firm since 2008. Rucks filed for divorce on May 12, 2014. The parties stipulated to May 1, 2014, as the date their marriage terminated.

**{¶ 3}** A trial focused largely on valuing the parties' assets and classifying certain property as marital or separate, and it took place before a magistrate over three dates: June 22, 2015, December 4, 2015, and March 4, 2016. On July 26, 2016, the magistrate issued a decision[1] that incorporated the parties' shared parenting agreement as well as the magistrate's determinations regarding the payment of child support and spousal support, the division of the parties' assets and liabilities, and the allocation of costs. Both Moore and Rucks filed objections to that decision.

**{¶ 4}** On November 30, 2017, the trial judge sustained in part and overruled in part each party's objections. A final judgment and decree of divorce consistent with those rulings was entered on February 23, 2018.

---

[1] The July 26, 2016 decision amended the magistrate's original decision issued on July 19, 2016.

**{¶ 5}** In his appeal from that final judgment, Moore raises six assignments of error:

1) The Court erred in deeming the four PNC accounts to be marital property.

2) The Court erred in deeming BOA account no. 9603 and its attendant CDs to be marital property.

3) The Court erred in failing to give [Moore] full credit for the down payment on the parties' marital residence.

4) The trial Court erred [in] ordering [Moore] to pay spousal support of $925.00 per month for an additional fifty-six months.

5) The trial Court erred in setting the amount of child support.

6) The trial Court erred in ordering that [Moore] was responsible for the cost of preparing a COAP with regard to his FERS account.

### First, Second and Third Assignments of Error—Property Division

**{¶ 6}** In his first, second and third assignments of error, Moore challenges the trial court's treatment of certain property or payments as marital property rather than as separate property to be awarded to Moore alone. Because these three assignments implicate the same standard of review and the same legal principles governing the division of property, we will address all three together.

*a. Standard of Review*

**{¶ 7}** We review property distributions in divorce proceedings for an abuse of discretion. *Payne v. Payne*, 2d Dist. Montgomery No. 27584, 2017-Ohio-8912, ¶ 6, citing *Loughman v. Loughman*, 2d Dist. Montgomery No. 25835, 2014-Ohio-2449, ¶ 22. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or

unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 8} "A trial court must indicate the basis for its division of marital property in sufficient detail to enable a reviewing court to determine whether the award is fair, equitable, and in accordance with the law." *Janis v. Janis*, 2d Dist. Montgomery No. 23898, 2011-Ohio-3731, ¶ 43, citing *Young v. Young,* 2d Dist. Clark Nos. 08CA59 and 08CA61, 2009-Ohio-3504, ¶ 6, and R.C. 3105.171(G). Additionally, a trial court's failure to consider the factors set forth at R.C. 3105.171(F) to guide the division of marital property is an abuse of discretion. *Mays v. Mays,* 2d Dist. Miami No. 2000-CA-54, 2001 WL 1219345, *6 (Oct. 12, 2001).

b. *Law Applicable to Division of Property in Divorce*

{¶ 9} "When dividing married parties' assets and liabilities upon divorce, a court must first determine what is marital property and what is not." *Bergman v. Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, ¶ 27. The trial court must classify specific property as marital or separate, and where appropriate, must distribute separate property to the owner. *Id.*, citing R.C. 3105.171(B) and (D). The court's classification must be supported by competent, credible evidence. *Id.*, citing *Mays* at *3; *Renz v. Renz,* 12th Dist. Clermont No. CA2010-05-034, 2011-Ohio-1634, ¶ 17.

{¶ 10} The classification of property is governed by R.C. 3105.171. Per R.C. 3105.171(A)(3)(a), "marital property" includes:

(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the

marriage;

(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage.

{¶ 11} In contrast, under R.C. 3105.171(A)(6)(a), "separate property" is defined, in pertinent part, as "all real and personal property and any interest in real or personal property that is found by the court to be any of the following:"

(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;

(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage

* * *

(vii) Any gift of real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

{¶ 12} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the

separate property is not traceable." R.C. 3105.171(A)(6)(b). Additionally, "the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital or separate property. Instead, the couple's total circumstances are reviewed." *Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, at ¶ 30, quoting *Nuding v. Nuding*, 3d Dist. Mercer No. 10-97-13, 1998 WL 856923 (Dec. 7, 1998). *See also* R.C. 3105.171(H).

**{¶ 13}** The proponent of a claim that specific property is separate, not marital, bears the burden to prove that claim by a preponderance of the evidence. *Bergman* at ¶ 31, citing *Peck v. Peck*, 96 Ohio App.3d 731, 734, 645 N.E.2d 1300 (12th Dist.1994); *Snyder v. Snyder,* 2d Dist. Clark No. 2002-CA-6, 2002 WL 1252835, *3. "Oral testimony as evidence, without corroboration, may or may not satisfy the burden." *Bergman* at ¶ 31, quoting *Maloney v. Maloney,* 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 23 (2d Dist.). As traceability presents a question of fact, we must defer to the trial court on that issue, "and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent, credible evidence." *Maloney* at ¶ 23, citing *C.E. Morris Co v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶ 14}** "Once it is proven that specific property was the separate property of one of the spouses at, or after, the time of the marriage, the burden shifts to the other spouse to prove, by clear and convincing evidence, that the property, or some interest therein, has been given to the other spouse." *Bergman* at ¶ 31, quoting *Snyder at *3*, citing *Helton v. Helton*, 114 Ohio App.3d 683, 685, 683 N.E.2d 1157 (2d Dist.1996).

    *c. Assignment #1 – PNC Accounts*

{¶ 15} Moore first asserts that the trial court erred by treating as marital property four PNC bank accounts held in Moore's name alone [accounts ending in 3092 and 3093, consisting of certificates of deposit] or held jointly in the names of Moore and his father, George R. Moore [accounts ending in 7658 and 7659].[2] The entirety of the trial court's findings as to those accounts is as follows, with certain citations to the record omitted:

> Lana testified that during the marriage, she was told that Edmund was listed on one bank account with his parents, so that he could access it in the event of his father's death. * * * A number of accounts that held Edmund's name became unveiled during the course of discovery herein. Lana had no knowledge of the totality of Edmund's PNC accounts, including accounts which are in Edmund's name alone, and some that are joint accounts held by Edmund and his father, George Moore. Lana testified that she does not accept the joint accounts with Edmund's father as premarital or non-marital gifts to Edmund, as she felt over the course of the marriage that he was hiding money. * * * Lana stated that another account, set up by Edmund's mother, which was payable on death to him, would be more consistent with someone who wanted to set up an account in the event of someone's death, but the other accounts name Edmund and his father as co-owners. * * * These PNC accounts were not disclosed on Edmund's Affidavit of Financial Disclosure. * * *

---

[2] Although Moore's appellate brief refers to the latter two accounts as ending in "7458 and 7459" (emphasis added), the trial court correctly observed that the documents related to those accounts bear the numbers 7658 and 7659. (See 11/30/17 Decision and Judgment, pp. 3, 5-6, 7).

Plaintiff's Exhibit 30, regarding PNC account 3092, shows account balances dating back to October 18, 2005, when a CD deposit was made. This account shows a balance as [sic] of $36,445.07 on April 30, 2014. The name on the account is Edmund H. Moore. Plaintiff's Exhibit 29 documents PNC account 3093, which shows an account balance of $60,109.26 on April 30, 2014. This document shows account balances back to September 30, 2000. The name on the account is Edmund H. Moore. Edmund testified that the PNC accounts 3092 and 3093 were started by his father in the 1990's, and that he had no knowledge of their existence until the divorce. * * * No additional evidence was presented to support Edmund's contention that these are separate accounts established prior to the marriage, or amounts in the accounts at that time.

Plaintiff's Exhibit 31 shows PNC account 7659, with the names Edmund H. Moore and George R. Moore and the relationship "JOI." Account 7659 had a balance of $7,700.03 on April 30, 2014. Plaintiff's Exhibit 32 shows PNC account 7658, with the names George R. Moore and Edmund H. Moore, with the relationship "JOI." Account 7658 had a balance of $10,730.68 on April 15, 2014. Edmund testified that he had no interaction with PNC accounts 7658 and 7659. * * * Edmund testified that he did not know when account 7658 was established. * * * Edmund testified that he reported interest from the PNC accounts on his tax return. * * * No additional evidence was presented to support Edmund's contention that these are separate accounts established prior to the marriage, or amounts in the

accounts at that time.

\* \* \*

The Court finds that Edmund has not shown, by a preponderance of the evidence, that the following accounts are separate property: PNC accounts 3092, 3093, 7658, and 7659. \* \* \* The Court finds that the accounts that are solely in Edmund's name, PNC accounts 3092 and 3093, shall be divided equally. The Court finds that the accounts held jointly by Edmund and his father, PNC accounts 7648 and 7659, \* \* \* shall be divided as follows: Lana shall receive an amount equivalent to one-fourth of the balances on the date nearest to May 1, 2014. \* \* \*

(11/30/17 Decision and Judgment, pp. 4-7).

**{¶ 16}** Moore contends that his testimony established that all four PNC accounts were created by his father, not by Moore, and contained contributions only from his father. However, uncorroborated testimony that property is separate rather than marital property may not satisfy the proponent's burden of proof. *See Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, at ¶ 31. Such testimony implicates credibility determinations generally left to the trial court, which is "able to view the witnesses and observe their demeanor, gestures and voice inflections." *See Edwards v. Edwards*, 2d Dist. Montgomery No. 25309, 2013-Ohio-117, ¶ 14, quoting *In re J.Y.*, 2d Dist. Miami No. 07-CA-34. 2008-Ohio-3484, ¶ 33.

**{¶ 17}** In this case, the trial court acknowledged Moore's testimony claiming that his father alone established and funded the PNC accounts, but nonetheless concluded that Moore had not proven that those accounts were "separate," non-marital property.

Nothing in the record compels us to disturb what is effectively the trial court's credibility determination on that point. While the record does reflect Moore's additional testimony that the birthdate associated with PNC accounts 7658 and 7659 was his father's birthdate, not Moore's, that evidence also does not address the issue most critical to the trial court's decision – i.e., whether the PNC accounts pre-existed the parties' marriage.

{¶ 18} Had Moore presented documentary evidence showing when the accounts were opened or the value of those accounts as of April 22, 2000, his testimony would have been corroborated and the trial court might have determined that Moore satisfied his burden of proving that all four PNC accounts were his separate property. Instead, the earliest date referenced in the documentary evidence regarding the PNC accounts was October 10, 2005, years after Moore and Rucks married. Aside from Moore's testimony, the record is devoid of evidence regarding the history of those accounts prior to that date.

{¶ 19} Because nothing in the record aside from Moore's testimony indicates that the four PNC accounts existed before the couple's marriage or that they contain no funds contributed by Moore, the trial court did not abuse its discretion in determining that Moore's full interest in accounts 3092 and 3093 and Moore's one-half interest in accounts 7648 and 7659 constituted marital property to be divided equally with Rucks in accordance with R.C. 3105.171(A)(3)(a). Moore's first assignment of error is overruled.

*d. Assignment #2 – BOA Account*

{¶ 20} We reach a different conclusion as to Moore's second assignment of error, which challenges the trial court's determination that Moore's share of a Bank of America ("BOA") checking account ending in 9603 and multiple certificates of deposit ("CDs") associated with that account were marital property. As to the BOA account, the trial court

stated as follows:

Edmund testified that the Bank of America Account 9603 * * * had a balance of $158,395.02 as of June 6, 2014. * * * This account is a joint account held by George Robert Moore "or" Edmund H. Moore. * * * This account holds a checking account, as well as multiple CD's [sic] which are shown as sub-account numbers. * * * All but one of the CD accounts are held jointly by Edmund and his father. * * * Plaintiff's Exhibits 49.1 and 38 consist of a significant number of checks written on BOA account 9603, by Edmund Moore, between 2008 and 2014, most of which are written to himself. Edmund testified that he began writing checks on this account as early as 2000. * * * Edmund testified that he used these funds for family expenses, e.g., paying for the family to attend an out of town funeral, or when the government went through a sequestration in 2013, and he needed money to cover household expenses. * * * Edmund testified that his father gave him permission to write these checks. * * * Edmund testified that anyone named on the account can spend money from that account. * * * Edmund testified that he did not fund these accounts and the money typically came from his father's retirement as a school teacher, or the military, or city council. * * * Plaintiff's Exhibits 49.2, 49.3, 49.4 and 49.5 all show deposits solely from the TRS of Georgia, with a reference to the name George R. Moore. No evidence is provided by Edmund to show the origination date of this account or its sub-accounts, or amounts in the account on the date of the marriage.

The Court finds that Edmund has not shown, by a preponderance of the evidence, that [BOA account 9603, including the checking account, and all of the CD sub accounts except for the one held in the name of Gemika Roshanda Moore], are separate property[.] * * * The Court finds that * * * a portion of the BOA account 9603 (as defined above)[ ] shall be divided as follows: Lana shall receive an amount equivalent to one-fourth of the balances on the date nearest to May 1, 2014. * * *

(11/30/17 Decision and Judgment, pp. 6-7).

{¶ 21} Moore contends that the trial court ignored the magistrate's finding that a signature card related to the BOA account and signed by both Moore and his father shows that such account was created on June 26, 1990. He notes that he testified "repeatedly" that he personally made no deposits to the BOA account, that all evidence of deposits to that account shows that his father made those deposits, and that the magistrate so found. Moore urges that the magistrate properly concluded that BOA checking account 9603 and the associated CDs were Moore's separate property, and that the trial court's contrary conclusion should be reversed.

{¶ 22} The record belies the trial court's finding that Moore provided no evidence to show when BOA account 9603 originated. Based on a signature card presented into evidence, Moore testified that his father opened account 9603 at Citizens and Southern National Bank on June 26, 1990, and that Moore added his signature to that account in 1995.[3] Although a different bank's name appears on that signature card, the record

---

[3] Although the transcript refers to that document as Defendant's Exhibit D (*see* Tr. Vol. IV, pp. 291-292), a copy of a document with those features appears in the record as "Defendant's Exhibit I."

demonstrates that Bank of America produced and authenticated the signature card, sufficiently establishing that such card is associated with the current BOA account bearing the same account number. Another document in the record shows that a BOA CD in the name of both Moore and his father was "reinvested" on April 20, 2000, at which time it had a value of $10,668.10.[4] Taken together, those two documents confirm that Moore's interest in what became BOA account 9603, and at least one associated BOA CD, existed prior to the parties' marriage. Moore thereby proved that his interest in BOA account 9603 and the proceeds of that particular CD were his separate property before he married Rucks. The burden then shifted to Rucks "to prove, by clear and convincing evidence, that [such] property, or some interest therein," was given to her by Moore. *See Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, at ¶ 31. Rucks failed to sustain that burden.

{¶ 23} In addition, the trial court expressly acknowledged that Moore's father appears to have been the source of all deposits to BOA account 9603 that are reflected in the bank records admitted into evidence. (See11/30/17 Decision and Judgment, pp. 6-7). Despite that acknowledgment, the trial court without explanation determined that Rucks was entitled to one half of Moore's interest in those deposits.

{¶ 24} The trial court erred by awarding Rucks one half of Moore's total interest in BOA account 9603 and the related CDs without requiring her to prove that Moore gifted her with a share of his interest in that separate property. *See Bergman* at ¶ 31. In so

---

[4] This particular document is included among other exhibits admitted at trial but has no clear marking to designate its exhibit number.

determining, we are mindful that the parties' inability to access older bank records[5] left them unable to reconstruct all transactions related to that account, and that we must defer to the trial court's traceability determination unless its findings are "against the manifest weight of the evidence." *See Maloney,* 160 Ohio App.3d 209, 826 N.E.2d 864, 2005-Ohio-1368, ¶ 23. Nevertheless, competent and credible evidence did not support the trial court's finding that Rucks was entitled to one half of Moore's interest in the entire balance of BOA account 9603 and the associated CDs as of the date nearest to May 1, 2014. To the contrary, the evidence showed that at least some portion of those balances consists of Moore's separate property acquired prior to the parties' marriage, and that other portions were attributable solely to deposits made by Moore's father during the course of the parties' marriage. Rucks presented no evidence to show that any portion of those accounts was given to her.

**{¶ 25}** We are not dissuaded from that conclusion by evidence that Moore wrote checks from BOA account 9603 to pay some of the couple's family expenses. Gifts made by a parent to a married adult child are not marital property if given to that child alone and not to the couple jointly, and "[t]he intention of the parents is not reflected in the use to which the recipient puts the gift." *Hook v. Hook*, 189 Ohio App.3d 440, 2010-Ohio-4165, 938 N.E.2d 1094, ¶ 22 (6th Dist.). Here, Moore's father explicitly put Moore's name and his own on the BOA accounts at issue. He also had a history of making gifts directly to Rucks that were intended for her alone.[6] The fact that a relative places a CD in the name

---

[5] Moore testified that the available bank records "only go back [ ] about 10 years." (Tr. Vol. IV, p. 322).

[6] In fact, Rucks testified that George Moore, her husband's father, gave her a wedding gift of $10,000.00, which she deposited into her own separate account. (Tr. Vol. III, pp.

of only one member of a married couple is "actually strong evidence that [the relative] intended the CD as a gift only to" that person. *Wolfangel v. Wolfangel*, 9th Dist. Summit No. 16868, 1995 WL 312697, *3 (May 24, 1995). No evidence supports the trial court's apparent conclusion that Moore's father intended his contributions to the BOA accounts to be the property of both Moore and Rucks.

**{¶ 26}** For the foregoing reasons, Moore's second assignment of error is sustained. This matter will be remanded to the trial court to re-designate the BOA checking account ending in 9603 and the related BOA CDs as Moore's separate property.

e.  *Assignment #3 – Down Payment on Marital Residence*

**{¶ 27}** Moore contends that the trial court erred by failing to credit him for the full down payment of $24,977.78 made on the parties' marital residence. On that subject, the trial court stated:

> Lana contends that the marital residence was purchased two months after the parties were married, and that the money used for the down payment is not clearly traceable to Edmund. Accordingly, [Lana argues that her] equity in the marital residence should not be reduced by the amount of the down payment, and she should be awarded an additional $12,488.89 (one-half of the down payment). Alternatively, Lana argues that $5,674.24 of the down payment should be considered marital as this amount was not traced to Edmund's pre-marital funds. This would result in an additional $2,837.12 towards Lana's equity in the marital residence.
>
> Edmund responds that Lana concedes that he sold stock in Cisco

220-222).

Systems and Intel Corporation totaling $19,303.54 prior to the purchase of the residence and that Lana does not explain how the parties could have accumulated a nearly $25,000.00 down payment on the marital home just two months into their marriage.

* * *

The parties were married on April 22, 2000, and their marital residence was purchased in late June 2000. The property is titled in Edmund's name. Edmund testified that the down payment for the home consisted of money from his June 19, 2000 sale of Cisco and Intel Corporation shares held in his Merrill Lynch account, for $6,520.00 and $12,782.97, respectively, for a total of $19,302.97. [Edmund testified that] [t]he remainder of the $24,477.78 down payment made on June 30, 2000 came from cash Edmund had in his checking account. No documentation was offered to identify the funding for the remainder of the down payment.

Lana testified that the parties used cash gifts from their wedding [ ] for the down payment on the house, which included a $10,000.00 wedding gift from Edmund's father and $2,000.00 in smaller cash gifts.

The Court finds that $19,302.97 of the down payment on the marital residence constitutes Edmund's separate property. The balance of the down payment was not traced to separate funds. According, $5,174.81 of the down payment is marital property, and Lana is credited for one-half of this amount toward her equity in the home, an additional $2,587.41.

(Citations to record omitted.) (11/30/17 Decision and Judgment, pp. 15-16).

**{¶ 28}** As the foregoing excerpt illustrates, the trial court chose not to credit Moore's testimony that his personal checking account was the source of the balance of the residence down payment not covered by the sale of Moore's stock, and instead to credit Rucks's testimony. In the absence of documentary evidence to the contrary, we are bound to accept the trial court's credibility determination to that effect. *See, e.g., Edwards*, 2d Dist. Montgomery No. 25309, 2013-Ohio-117, ¶ 40 ("The trial court was entitled to decide which testimony to credit, since it was in the position to view the witnesses and assess their credibility.").

**{¶ 29}** We cannot say that the trial court erred in determining that Rucks was entitled to a credit of $2,587.41 for her one-half interest in the $5,174.81 balance of the down payment not proven by corroborating evidence to have been paid from Moore's separate property. As a result, Moore's third assignment of error on that basis is overruled.

### Fourth Assignment of Error—Spousal Support

**{¶ 30}** Moore argues that the trial court erred with respect to both the duration and amount of spousal support that he was ordered to pay to Rucks – i.e., 56 months at $925 per month, beyond what he had paid in temporary support.[7] Specifically, Moore suggests that the trial court allowed a longer term because it unfairly assigned blame for delays in the case to Moore's "recalcitrance in participating in discovery" (see 11/30/17 Decision and Judgment, p. 10), and that the court lacked a reasonable basis for ordering 56 months of spousal support instead of the 54 months that Rucks actually requested. We disagree.

---

[7] Moore's appellate brief mistakenly lists the monthly award as "$9**1**5.00." (Emphasis added.) (Brief of Appellant, p. 12).

{¶ 31} In determining whether spousal support is appropriate and reasonable, as well as its amount, nature, and duration, a trial court must consider a variety of factors. *Baskin v. Baskin*, 2d Dist. Montgomery No. 27373, 2017-Ohio-7632, ¶ 10. These factors include: 1) the parties' income from all sources; 2) their relative earning abilities; 3) their ages and physical, mental, and emotional conditions; 4) the retirement benefits of the parties; 5) the duration of the marriage; 6) the extent to which it would be inappropriate for a party to seek employment outside the home (particularly if a custodian of a minor child of the marriage); 7) the parties' standard of living during the marriage; 8) their relative educations; 9) the parties' relative assets and liabilities; 10) the contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party; 11) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment; 12) the tax consequences, for each party, of an award of spousal support; and 13) the lost income production capacity of either party that resulted from that party's marital responsibilities. R.C. 3105.18(C)(1). The court also may consider any other factor that it expressly finds to be relevant and equitable. R.C. 3105.18(C)(1)(n).

{¶ 32} A trial court "enjoys broad discretion" with regard to awards of spousal support. *Morgan v. Morgan*, 2d Dist. Montgomery No. 27164, 2017-Ohio-402, ¶ 47. Having reviewed the record, we cannot conclude that the trial court abused that discretion in awarding spousal support in this case. As Moore admits in his brief, the trial court specifically addressed the relevant factors under R.C. 3105.18(C)(1) in reaching its decision. After noting the nearly $50,000 discrepancy between the parties' respective

earnings in 2015, the trial court determined that a spousal support award for a "term of fifty-six (56) months is reasonable and appropriate given the length of the marriage."

{¶ 33} Given the care the trial court took to spell out the duration of its award both numerically ["56"] and in long form ["fifty-six"], we are not persuaded by Moore's argument that the two-month increase over the 54 months Rucks requested "can only be explained as a typographical error" that this court should correct. To the contrary, we conclude that the trial court acted within the scope of its discretion in determining that four years and six months of spousal support was appropriate in light of a 14-year marriage and the parties' relative earning capacities in their respective careers. Additionally, while the $925 monthly amount represents an increase of $175 over the temporary monthly support of $750 to which the parties had agreed, that amount is $175 *less* than the $1,100 per month that Rucks requested going forward. Arriving at the amount of $925 fell within the trial court's discretion.

{¶ 34} Finally, despite Moore's objection that he "had already been responsible for spousal support of 41 months," some of which was due to Rucks's own discovery delays and "a problem" with acquiring the trial transcript, we again conclude that the trial court acted within its discretion by considering what it deemed Moore's "recalcitrance in participating in discovery" as a factor influencing the spousal support award. The applicable statute specifically authorizes courts to consider any "relevant and equitable" factor. R.C. 3105.18(C)(1)(n). In this case, the trial court detailed both Moore's lack of cooperation in discovery and what the court perceived to be his "financial misconduct" in failing to disclose all bank accounts bearing his name. (See 11/30/17 Decision and Judgment, pp. 16-20). In light of those circumstances, we cannot say that the trial court

erred by awarding an additional 56 months of spousal support beyond the 41 months for which Moore had already been responsible while the divorce was pending. His fourth assignment of error is overruled.

### Fifth Assignment of Error—Child Support

{¶ 35} As with property distributions, we review child support calculations for an abuse of discretion. *Payne*, 2d Dist. Montgomery No. 27584, 2017-Ohio-8912, at ¶ 6, citing *Abrams v. Abrams*, 2d Dist. Montgomery No. 27345, 2017-Ohio-4319, ¶ 39. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶ 36} Moore argues that the trial court erred by failing to order a downward departure from the child support guideline amount, given that the parties share parenting time equally and their combined annual incomes exceed the $150,000 threshold contemplated by the child support statute. *See* R.C. 3119.04(B). That statute provides in pertinent part as follows:

> If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court * * * shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand

dollars, unless the court * * * determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court * * * makes such a determination, it shall enter in the journal the figure, determination, and findings.

**{¶ 37}** Under that statute, then, if the combined income of both parents is greater than $150,000, the appropriate standard for the amount of child support is that amount necessary to maintain the standard of living the children would have enjoyed had the marriage continued. *Murray v. Murray*, 128 Ohio App.3d 662, 716 N.E.2d 288 (12th Dist. 1999). When that income threshold is met, trial courts are empowered to extrapolate upward from the amounts provided under the standard child support schedule. *See, e.g., Cummin v. Cummin*, 55 N.E.3d 467, 2015-Ohio-5482, ¶ 16 (4th Dist.) (finding "no abuse of discretion * * * in 'extrapolating' child support based upon the parties' actual combined incomes"); *Lanham v. Mierzwiak*, 197 Ohio App.3d 426, 2011-Ohio-6190, 967 N.E.2d 1256, ¶ 23 (6th Dist.) (finding trial court does not err "if it use[s] the extrapolation method to determine the amount of child support due" where combined incomes exceed $150,000); *Moore v. Moore*, 182 Ohio App.3d 708, 2009-Ohio-2434, 914 N.E.2d 1097, ¶ 16 (3d Dist.) (R.C. 3119.04(B) "does not prohibit trial courts from extrapolating"); *Cyr v. Cyr*, 8th Dist. Cuyahoga No. 84255, 2005-Ohio-504, ¶ 56 ("trial court would not have erred * * * if it used the extrapolation method"). The statute "leaves the determination [of child support] entirely to the trial court's discretion" when combined incomes exceed $150,000. *Brown v. Brown*, 14 N.E.3d 404, 2014-Ohio-2402, ¶ 55 (8th Dist.).

**{¶ 38}** Asserting that the magistrate "obviously extrapolat[ed]" to reach the child support amount ordered, Moore contends that "no one presented any evidence of the

parties' standard of living." He also urges that the trial court based its award of $648 per month per child in part on the cost of private school tuition for one of the couple's minor daughters, although "[n]o evidence was submitted as to a <u>need</u> for their daughter to attend a private school," or of Moore's agreement that she should remain there. (Emphasis sic.) Those arguments are not well taken.

{¶ 39} Attending private school is one aspect of a child's standard of living. *See Rand v. Rand*, 18 Ohio St.3d 358, 361, 481 N.E.2d 609 (1985), quoting *In re Landis*, 5 Ohio App.3d 22, 28, 448 N.E.2d 845 (10th Dist. 1982). ("Appellant's obligation is to pay money for the support of his children, *including tuition for their attendance at a private school if that be reasonable and consistent with the standard of living the children would have enjoyed had the marriage continued.*") (Emphasis added.). This court also has affirmed a father's obligation to contribute to the parochial school tuition of his minor child. *See Worthen v. Worthen*, 2d Dist. Clark No. 2002 CA 33, 2002-Ohio-5587.

{¶ 40} Particularly given the evidence that Moore's daughter already was attending private school prior to her parents' divorce, the trial court did not err by holding Moore responsible for financially supporting his daughter's ability to maintain that educational standard of living. *See id.* at ¶ 15 (noting that the child in *Worthen* "had attended religious school prior to the divorce, and the court's order only allowed the mother to continue with that practice."). Moore's fifth assignment of error is overruled.

### *Sixth Assignment of Error—Allocation of COAP Cost*

{¶ 41} Moore's final assignment of error targets the trial court's order that Moore pay the cost of obtaining a court order acceptable for processing ("COAP") relative to his Federal Employees Retirement System ("FERS") account. A COAP must be submitted to

the appropriate government agency in order to effectuate the distribution of federal retirement benefits after a divorce. *See Schetter v. Schetter*, 2d Dist. Clark No. 2010 CA 35, 2001-Ohio-246, ¶4-5. Moore contends, however, that the trial court mistakenly determined that "[t]he parties stipulated to Edmund paying for the preparation of the COAP." (*See* 11/30/17 Decision and Judgment, pp. 15-16). According to Moore, only Rucks's attorney stated that Moore would be responsible for that cost. He thus asserts that the trial court erred by assigning that cost to him without an agreement on that point.

{¶ 42} The trial transcript reflects the following discussion regarding Moore's FERS account:

[RUCKS'S COUNSEL]: * * * On federal retirement. Do we have agreement on that or where are we?

[MOORE'S COUNSEL]: I mean, she's entitled to whatever that sum is. As I was explaining, I think there was, there is a difference between what we typically would have done with the FERS account versus what this account states. So based on whatever she is entitled to, you know, fine. She can [sic] it's whatever she's entitled to on his FERS, that would be, you know, whatever it is.

[RUCKS'S COUNSEL]: Okay. * * * So we will do a coverture fraction * * * And we are asking to be given the option to request a joint and survivor annuity. Is he in agreement with that?

[MOORE'S COUNSEL]: No. Not at this point.

[RUCKS'S COUNSEL]: Okay. So that's still an issue. *Do we have an agreement on preparation of that? I think it's a co-app.*

[Moore's counsel]: *For FERS? We will go back in and work that.*

[RUCKS'S COUNSEL]: So the husband will be responsible for the cost of preparing the co-app or QDRO and if there is any administrative fees with court costs, we'll split those.

(Emphasis added.) (Tr. Vol. II, pp. 28-29).

**{¶ 43}** Although Moore correctly observes that it was Rucks's attorney who stated that Moore would pay the cost of preparing a COAP for the FERS account, her statement was a reasonable interpretation of Moore's attorney's statement that "[w]e will go back in and work that." Moreover, after Rucks's attorney made that statement, Moore's attorney did not correct her, thereby implicitly agreeing with her interpretation. Nor did Moore himself, who was present during the discussion, raise any objection, although he did interject as to other matters. (*See, e.g.*, Tr. Vol. II, pp. 26-27, 34).

**{¶ 44}** Furthermore, shortly after the foregoing discussion, the following exchange took place:

THE COURT: Mr. Moore, did you hear and understand everything that was read into the record today?

[MOORE]: Yes.

THE COURT: Is this, in fact, your agreement?

[MOORE]: Yes, Your Honor.

THE COURT: Do you have any additions, corrections, or misstatements that you would like to have clarified for the record?

[MOORE]: No.

(Tr. Vol. II, p. 39).

{¶ 45} Moore thereby affirmatively agreed with the earlier statement of Rucks's attorney that Moore would be responsible for the cost of the COAP. The trial court did not err by adopting the uncorrected statement to that effect.

{¶ 46} Moreover, even if the trial court were mistaken in its impression that Moore had agreed to pay the cost of preparing the COAP (which we do not find), that mistake would not warrant overturning the trial court's order regarding payment of that cost. A trial court has discretion to award litigation expenses in a divorce action "to either party." R.C. 3105.73(A); *see also McKay v. McKay*, 2d Dist. Montgomery No. 23702, 2010-Ohio-3348, ¶ 24. The trial court did not abuse that discretion in ordering Moore to pay the cost of the COAP needed as to his FERS account. Moore's sixth assignment of error is overruled.

### *Conclusion*

{¶ 47} The trial court's judgment will be reversed as to the order that Moore's interest in the Bank of America account ending in 9603, including the checking account and the CD sub accounts, be treated as marital property. The matter will be remanded for further proceedings consistent with this decision. The judgment will be affirmed in all other respects.

. . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Lana J. Rucks
Richard Hempfling
Hon. Denise L. Cross